IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-60714
_____

IN RE:   GRAND JURY PROCEEDINGS

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(December 22, 1994)

Before KING, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

PER CURIAM:

     This is an appeal from an order of the district court
directing two attorneys to comply with a subpoena *duces tecum*
issued by a grand jury.  The attorneys moved to quash the
subpoena on grounds that the documents requested by the
government were privileged under the work product doctrine.  The
district court denied the motion to quash and turned over two of
the documents to the government.  The district court also
determined that the remaining documents, which are presently in
the custody of the district court, were to be turned over to the
government.  On October 27, 1994, this court granted a temporary
stay to block delivery of the remaining documents pending review
of the district court's turnover order.  For the reasons
elaborated below, we reverse the judgment of the district court
and remand for an evidentiary hearing to determine whether the

government can establish the requisite need to overcome the work product privilege.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In March 1992, the law firm of Rogers & Wells was consulted regarding the potential representation of a wealthy Mexican citizen, Ricardo Aguirre-Villagomez ("Aguirre"), his wife, Rosalinda Silva de Aguirre ("Silva"), his daughter, Gloria Aguirre, and Green Mountain Holdings, Ltd. ("Green Mountain"), an investment company owned by the Aguirre family.  After Aguirre was reported killed in an automobile accident in Mexico[1], Silva and Gloria Aguirre formally retained Rogers & Wells in an effort to obtain the release of a $25 million investment portfolio held by Green Mountain which had been seized by the government in connection with a civil forfeiture action.

In February 1993, believing Aguirre's death to have been falsified, the government indicted Aguirre on narcotics and money laundering charges, dismissed the civil forfeiture proceeding against Green Mountain, and began a criminal forfeiture action against Green Mountain and other property owned by Aguirre.  In response, Rogers & Wells' attorneys filed a suggestion of death and moved to dismiss the indictment and obtain a release of the Green Mountain portfolio.

---

[1] The government's brief states that Aguirre's body was never recovered and contends that Aguirre is still alive and presently in hiding.

In August 1993, the motion to dismiss the indictment against Aguirre was denied. On September 1, 1993, Rogers & Wells terminated its representation of the Aguirre family interests. In 1994, the government indicted Silva on a charge of money laundering. She agreed to cooperate with the authorities and entered a guilty plea.

On October 4 and 5, 1994, the government served subpoenas *duces tecum* on two Rogers & Wells' attorneys: Mark Pomerantz, a partner in the firm's New York office, and Whitney Adams, an associate in the firm's Washington, D.C. office. The subpoenas directed Pomerantz and Whitney to testify before a grand jury in the Southern District of Texas and ordered them to produce all "notes, memoranda, or any document pertaining to any interviews of any person pertaining to this case" and "[a]ny records, notes, memoranda, or any document referencing any conversation between any employee of Rogers & Wells and any of [certain specified] individuals." The government obtained express waivers of the attorney-client privilege from Silva, Gloria Aguirre, and Green Mountain.

Whitney and Pomerantz have turned over many non-privileged documents to the grand jury; however, believing other documents to be privileged under the work product doctrine, Whitney and Pomerantz filed a motion to quash or modify the subpoenas, and submitted all of the disputed documents to the district court for *in camera* inspection. These documents included, *inter alia*, internal law firm memoranda, e-mails, draft pleadings, and

memoranda to file, including memoranda of conversations with third parties.

On October 21, 1994, the district court held a hearing on the motion to quash or modify and ruled that the documents were not privileged under the work product doctrine. Although the basis for the court's ruling is not entirely clear, it appears to be based on the district court's conclusions that the work product privilege does not apply to communications with third parties and does not extend to subsequent litigation. The district court ordered Pomerantz and Whitney to redact those portions of the documents which reflected litigation strategy but to leave intact those portions which revealed any third party communications. In order to define for the parties the scope of its ruling, the district court reviewed two of the documents *in camera* and identified for Pomerantz and Whitney those portions of the two documents that it believed could be redacted pursuant to its turnover order. The district court then ordered Pomerantz and Whitney to redact the documents in accordance with its order and submit all redacted documents to the district court for turnover to the government by November 1, 1994.

On October 24, 1994, Pomerantz and Whitney formally submitted the redacted documents to the district court. The following day, the district court turned two of the redacted documents over to the government. Pomerantz and Whitney then asked the district court to stay its turnover order to prevent disclosure of the remaining documents. The district court denied

4

the requested stay and informed the parties that "I am going to turn them [the remaining documents] over to the Government unless the Circuit tells me not to."

On October 25, 1994, Pomerantz and Whitney filed a notice of appeal and asked this court to grant an emergency stay of the district court's turnover order. On October 27, 1994, this court granted the requested stay pending consideration of the merits of the district court's work product ruling.

The government argues that the district court's turnover order was appropriate and makes four arguments on appeal: (1) this court lacks subject matter jurisdiction to consider the appeal because the district court's order is not final absent a finding of contempt against Pomerantz and Whitney; (2) the work product privilege does not protect documents which reflect conversations with third parties; (3) the work product privilege does not extend to subsequent litigation; and (4) the work product privilege is inapplicable in this case because the crime/fraud exception permits discovery of work product documents if the client was engaged in a crime or fraud. Finding the first three of these arguments to be without merit, and the fourth to be not sufficiently developed in the district court to provide an alternative means of upholding the district court's decision, we reverse the judgment of the district court and remand for a determination of whether the government can establish the requisite need for the remaining documents. We now proceed to address each of the government's arguments in turn.

5

## II. ANALYSIS

*A. Is there a "final order" over which this court may exercise jurisdiction?*

The government contends that this court lacks subject matter jurisdiction to entertain this appeal because the district court's order is not a "final decision" within the meaning of 28 U.S.C. § 1291. To be appealable, an order must be either: (1) final; (2) fall within a specific class of interlocutory orders made appealable by statute, see, e.g., 28 U.S.C. § 1292(a); or (3) fall within some jurisprudential exception. Lakedreams v. Taylor, 932 F.2d 1103, 1107 (5th Cir. 1991).

The government correctly recites the general rule that a denial of a motion to quash a subpoena is not final until the individual seeking to quash disobeys the court order and is held in contempt. New York Times Co. v. Jascalevich, 439 U.S. 1304, 1305-06 (1978); United States v. Ryan, 402 U.S. 530, 532-33 (1971); Cobbledick v. United States, 309 U.S. 323, 327-28 (1940); In re Grand Jury Subpoena, 926 F.2d 1423, 1429-30 (5th Cir. 1991). This general rule, however, is just that: a general rule. The courts have carved out numerous exceptions, the most applicable one in this case being the so-called "collateral order doctrine" which permits immediate appeal of a trial court order if it "conclusively determine[s] the disputed question, resolve[s] an important issue completely separate from the merits of the action, and [is] effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468

6

(1978) (citations omitted).  The Supreme Court first announced the collateral order doctrine in the landmark case of Cohen v. Beneficial Loan Corp., 337 U.S. 541 (1949), which explained that the exception is necessary to permit appellate review in those cases where waiting for a final judgment "will be too late effectively to review the present order, and the rights conferred [upon the appellant] . . . will have been lost, probably irreparably."  Id. at 546.

We believe that the requirements for the invocation of the collateral order doctrine have been satisfied in this case. First, the district court's turnover order has been fully executed by the appellants and the district court explicitly stated, "Well, I think generally the issue is appealable now. . . . I want you to preserve your right to appeal.  I want you to be able to take up these things . . . ."

Normally, orders to turn over property to a court officer (such as a receiver) are not considered final orders which can be appealed.  Jascalevich, 439 U.S. at 1306; United States v. Beasley, 558 F.2d 1200, 1201 (5th Cir. 1977); Wark v. Spinuzzi, 376 F.2d 827 (5th Cir. 1967); see generally Charles Alan Wright, et al., 15A Federal Practice and Procedure § 3910 n.38 (2d ed. 1991) (citing cases).  This is so because in such cases, "whether the materials will eventually be released to the defense and the public is a matter yet to be litigated."  Jascalevich, 439 U.S. at  1306.  Thus, it would appear at first blush that the district court's turnover has not been conclusively decided because the

7

district court itself, not the government, presently has possession of the documents. Yet a closer look at the October 24, 1994 turnover order reveals that the order contemplates turnover of all documents to the *government*, not to the court. In such situations where a court has possession of property and thereafter issues an immediately enforceable order to turn over the property to the other party, the order is sufficiently ripe for appellate review. The reason for this rule is obvious: if the court already has lawful possession of the documents, a subsequent turnover order will be immediately enforceable without the necessity of holding the property owner in contempt. Cf. Perlman v. United States, 247 U.S. 7, 13 (1918) (holding turnover order to be final as to third party intervenor whose property was in custody of trial court at time order issued).

In this case, there is an immediately enforceable order to turn over the remaining documents. Judge Vela stated that "I am going to turn them [the disputed documents] over to the Government unless the Circuit tells me not to." The written turnover order denying the motion to "withhold said documents from the government until Movants' appeal of the Court's turnover order has been ruled upon by the Fifth Circuit" echoes this determination.

It seems clear that the district court considers its turnover order to have been executed and complied with such that it intends to turn the documents over to the prosecution without having to hold Pomerantz and Adams in contempt. It would be

absurd to decline jurisdiction on grounds that Pomerantz and Adams must await a judgment of contempt which Judge Vela has so clearly indicated will not be forthcoming.

Second, the turnover order clearly presents an important issue that is completely separate from the merits of the underlying grand jury investigation. Third, denying appellate review would result in irreparable injury because the district court's ruling on the two redacted documents also extends to the remaining documents which have not yet been turned over to the government. If these documents are turned over, Pomerantz and Adams will irretrievably lose any protectible interest they have in such documents.

In short, the district court already has possession of these documents and it believes it can turn them over to the prosecution unless this court says otherwise. To decline jurisdiction on grounds that there has been no final order would mean that we are impuissant to prevent the irreparable harm that will occur if the district court's turnover order is in error. In the words of the Supreme Court in Perlman v. United States, 247 U.S. 7 (1918), to decline jurisdiction on grounds that there has been no adjudication of contempt would leave Pomerantz and Adams "powerless to avoid the mischief of the order." Id. at 13. We decline the invitation to construe the final order doctrine in such a manner. Accordingly, we believe that the unique dilemma presented by this case warrants invocation of the collateral order doctrine and permits us to exercise subject matter

9

jurisdiction.  We now turn to analyze the district court's turnover order on the merits.

*B.  Does the work product privilege prevent disclosure of communications with third parties?*

Pomerantz and Adams characterize the district court's turnover order as resting exclusively on the conclusion that the work product privilege is coextensive with the attorney-client privilege in that it does not provide immunity for communications with third parties.  While the district court clearly indicated that it did not believe that communications with third parties were covered by the work product doctrine, it is not clear that the district court based its ruling exclusively on such grounds.  Whatever the district court's reasoning, however, we find it necessary to reiterate that "the mere voluntary disclosure to a third person is insufficient in itself to waive the work product privilege."  Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989).  Rather, the test for whether a third party communication is privileged by the work product doctrine is whether the information recorded by the attorney is "obtained or prepared by an adversary's counsel with an eye toward litigation."  Hickman v. Taylor, 329 U.S. 495, 511 (1947).  Even if a third party communication is obtained or prepared with an eye toward litigation, it may be discoverable if the "one who would invade that privacy [can] establish adequate reasons to justify production."  Furthermore, to the extent that the documents in question reflect oral conversations made by third

10

parties to Pomerantz and Adams, <u>Hickman</u> makes it clear that discovery may be had only in a "rare situation," because of the danger that the attorney's version of such conversations is inaccurate and untrustworthy. <u>Id.</u> at 513. Perhaps more importantly, the stricter limits on disclosure of work product which results from oral communications with third parties is also necessary due to the likelihood that such documents will reveal the attorney's mental processes or litigation strategy. <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 400 (1981); <u>see</u> Fed. R. Civ. P. 26(b)(3).

While <u>Hickman</u> does not spell out the burden of proof which the government must carry in order to obtain discovery of documents based upon oral communications with third parties, the Supreme Court in <u>Upjohn Co. v. United States</u>, 449 U.S. 383 (1981) clarified that the requisite showing is "far stronger" than for other work product documents. <u>Id.</u> at 402. Specifically, the <u>Upjohn</u> court stated that "[a]s Rule 26 [of the Federal Rules of Civil Procedure] and <u>Hickman</u> make clear such work product [based on oral statements from third parties] cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship." <u>Id.</u> at 401; <u>see also</u> Fed. R. Civ. P. 26(b)(3).[2]

---

[2] While the Federal Rules of Civil Procedure are not applicable to grand jury proceedings such as this case, <u>Hickman</u>-- and presumably its progeny such as <u>Upjohn</u>-- is. <u>See</u> <u>United States v. Nobles</u>, 422 U.S. 225, 236 (1975) (extending <u>Hickman</u>'s work product privilege to the criminal context); <u>see also</u> F<small>ED</small>. R. C<small>RIM</small>. P. 16(b)(2) (establishing work product protection in pretrial criminal context).

*C. Does the work product privilege extend to subsequent litigation?*

The government argues that the work product privilege recognized in <u>Hickman</u>-- which was extended to the criminal context in <u>United States v. Nobles</u>, 422 U.S. 225, 236 (1975)-- evaporates when the litigation for which the document was prepared has ended. <u>Hickman</u> and its progeny, however, do not delineate a temporal scope for the privilege.

In the context of Rule 26 of the Federal Rules of Civil Procedure-- which was modeled upon <u>Hickman</u>, <u>see</u> Fed. R. Civ. P. 26(b)(3), advisory committee's notes to 1970 amendment-- the Supreme Court recognized that "the literal language of the Rule protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation." <u>FTC v. Grolier, Inc.</u>, 462 U.S. 19, 25 (1983). In <u>Grolier</u>, the Supreme Court held that the work product privilege contained in Exemption 5 of the Freedom of Information Act[3] extended to subsequent litigation. The Court proclaimed that it was "not rely[ing] exclusively on any particular construction of Rule 26(b)(3) . . ." in reaching its decision, but was independently relying on the statutory language of Exemption 5. <u>Id.</u> Nonetheless, <u>Grolier</u> provides a strong hint that Rule 26

---

[3] Exemption 5 exempts from public disclosure "interagency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).

and *a fortiori*, Hickman (which is the genesis of Rule 26), applies to subsequent litigation.

The emerging majority view among the circuits which have struggled with the issue thus far seems to be that the work product privilege does extend to subsequent litigation.  One circuit, the Third Circuit, appears to extend the work product privilege only to "closely related" subsequent litigation.  In re Grand Jury Proceedings, 604 F.2d 798, 803-04 (3d Cir. 1979). A broader view, exemplified by the Fourth, Sixth and Eighth Circuits, is that the privilege extends to all subsequent litigation, related or not.  See  United States v. Pfizer, Inc. (In re Murphy), 560 F.2d 326, 335 (8th Cir. 1977); United States v. Leggett & Platt, Inc., 542 F.2d 655, 660 (6th Cir. 1976), cert. denied, 430 U.S. 945 (1977); Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 487 F.2d 480, 484-85, n.15 (4th Cir. 1973).

We need not choose between these two alternative theories at this time because the documents sought to be discovered in this case satisfy both.  The original litigation for which the documents were prepared involved the seizure of the Green Mountain portfolio pursuant to a criminal investigation of money laundering by Aguirre.  The grand jury investigation for which the documents are now being sought is merely a broadened investigation of money laundering by Aguirre and others.  Thus, the litigation for which the Rogers & Wells attorneys prepared the documents is unquestionably "closely related" to the grand

13

jury investigation for which they are presently being sought. Accordingly, whichever view of the temporal scope of the work product privilege one prefers, it is clear that the documents sought in this case are still protected by the work product privilege.

*(3) Does the crime/fraud exception apply in this case?*

This court has clearly recognized the validity of a crime/fraud exception to the work product privilege. See In re Burlington Northern, Inc., 822 F.2d 518, 524-25 (5th Cir. 1987), cert. denied, 484 U.S. 1007 (1988). One question we have as yet not answered, however, is whether the crime/fraud exception will permit disclosure of materials when the attorney who prepared the materials had no knowledge that his efforts were furthering his client's criminal activity. In this case, the government concedes that Pomerantz and Adams are not suspected of criminal involvement.

In the attorney-client privilege context, the crime/fraud exception permits disclosure of any communications between the attorney and client if the client seeks advice from the attorney in carrying out a crime or fraud. 1 McCormick on Evidence § 95, at 350 (John William Strong ed., 4th ed. 1992). The test is whether the client's purpose is the furtherance of a future fraud or crime. Id. However, this focus on the client's purpose appears to be driven by the fact that the attorney-client privilege is, of course, held by the client and not the attorney.

14

In contrast to the attorney-client privilege, the work product privilege belongs to both the client and the attorney, either one of whom may assert it. Thus, a waiver by the client of the work product privilege will not deprive the attorney of his own work product privilege, and vice versa. What is unclear, however, is whether a prima facie case of fraud or criminal activity by the *client* will be sufficient to invoke the crime/fraud exception if the party asserting the work product privilege is an innocent attorney.

Numerous courts have agreed that, in the specific context of the work product privilege, an innocent attorney may invoke the privilege even if a prima facie case of fraud or criminal activity has been made as to the client. See United States v. Under Seal (In re Grand Jury Proceedings, Thursday Special Grand Jury September Term 1991), 33 F.3d 342, 349 (4th Cir. 1994) ("The record in the case does not indicate that the attorney engaged in . . . misconduct . . . and, therefore, the attorney may not be said to have waived his right to assert the work product privilege."); In re Sealed Case, 676 F.2d 793, 812 (D.C. Cir. 1982) (noting that the crime/fraud exception applies "[u]nless the blameless attorney is before the court with an independent claim of privilege."); In re Special September 1978 Grand Jury, 640 F.2d 49, 63 (7th Cir. 1980) (commenting that when the work product privilege is asserted by an innocent attorney, the invasion of the attorney's privacy occasioned by divulging his work product is "not justified by the misfortune of representing

15

a fraudulent client."); <u>In re Grand Jury Proceedings</u>, 604 F.2d 798, 802 n.5 (3d Cir. 1979) (stating that an "attorney, without knowledge of his client's illegal activity, might nevertheless properly claim and prevail in asserting a work product privilege.").

The district court, although aware of the crime/fraud exception, does not appear to have rested its decision thereon. The government, perhaps sensing the weakness of the district court's actual bases for its ruling, argues that because the district court and the parties had a "discussion" about the applicability of the crime/fraud exception, this court should feel free to invoke the crime/fraud exception as an alternative basis for upholding the district court's decision. We decline this invitation. It would not be prudent to address an issue which was, at most, the subject of a brief "discussion" in the trial court.

### III. CONCLUSION

We conclude that: (1) the collateral order doctrine permits appellate review of the district court's turnover order; (2) the work product privilege encompasses third party communications; and (3) the work product privilege extends to protect the documents in this case despite the fact that the litigation for which they were prepared has terminated. Thus, we REVERSE and REMAND to the district court for consideration of whether the

16

government has made a sufficient showing to overcome the work product privilege.[4]

---

[4] The government argues in its brief that it has established substantial need for the evidence being sought and undue hardship if the privilege shields third party communications. We decline the invitation to entertain this argument on appeal, however, because the district court did not address this issue and we believe it would be more appropriate to let the district court make this determination after a full adversarial hearing.