**In re GENERAL AGENTS INSURANCE COMPANY OF AMERICA, INC., Relator.**

**No. 14–06–00930–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 15, 2007.

---

R. Brent Cooper, Michelle Elaine Robberson, Dallas, for appellants.

Benjamin L. Hall, III, David W. Holman, Elizabeth D. Hawkins, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and SEYMORE.

## OPINION

ADELE HEDGES, Chief Justice.

In its petition for writ of mandamus, relator, General Agents Insurance Company of America, Inc. ("Gainsco"), requests that we direct respondent, the Honorable Elizabeth Ray, presiding judge of the 165th District Court, to vacate and set aside her order compelling production of Gainsco's insurance claims file related to a lawsuit against Traxel Construction, Inc., one of Gainsco's insureds. Specifically, Gainsco contends that the trial court erred in (1) ordering production of documents relating to the underlying action against Traxel, (2) ordering production of documents relating to the current coverage suit against Gainsco, and (3) refusing to permit redaction of reserves information from produced documents. Granting relief in part, we conditionally grant the petition for writ of mandamus.

## I. Background

Real parties in interest, El Naggar Fine Arts Furniture, Inc. and Ahmed El Naggar (collectively "El Naggar"), contracted with Frederick Bell and, subsequently, his corporation, Traxel, for the construction of a steel building and a concrete slab. Problems arose and, in 2001, El Naggar filed suit against Bell, Traxel, and other parties, alleging defective construction. Gainsco had previously issued a $500,000 commercial general liability policy to Traxel, covering from March 22, 2000 to March 22, 2001. Gainsco retained attorney Glen Fahl as Traxel's defense counsel, assigned Sharon Preen as claims adjuster, and established a claims file in connection with the proceeding. Gainsco also requested and received a coverage opinion regarding the El Naggar lawsuit from another attorney, Brent Cooper.

The first trial in the action ended in a mistrial. Shortly before the second trial was to begin, Gainsco and Traxel entered into a "buy-back agreement," dated October 6, 2004. Under the terms of this agreement, Gainsco repurchased Traxel's $500,000 policy for $50,000, and Traxel released Gainsco from any and all claims or demands arising out of the policy. As further consideration, Traxel and Gainsco agreed that the terms would remain confidential, "except that counsel for Traxel may tell opposing counsel that there is no insurance available." However, a handwritten and initialed notation on the agreement provided that Traxel could "supplement discovery in this pending litigation by supplying this agreement." Shortly thereafter, Traxel produced a copy of the agreement to El Naggar. The lawsuit proceeded to a second trial, which resulted

in a $3.5 million judgment in El Naggar's favor, dated August 8, 2005.

El Naggar subsequently sued Gainsco (along with other of Traxel's insurers, which are no longer parties), alleging that the Gainsco–Traxel policy provided coverage for El Naggar's claims, Gainsco breached its insurance contract with Traxel, and the buyback agreement violates public policy. El Naggar additionally asserted claims for fraudulent transfer, civil conspiracy, DTPA violations, insurance code violations, breach of the duty of good faith and fair dealing, and tortious interference with contract. Some of the claims are based on an assignment of rights Traxel granted to El Naggar, on which, El Naggar claims the right to sue on its own behalf and as Traxel's assignee.

In discovery requests, El Naggar asked for materials contained in Gainsco's claims handling file, pertaining to both the underlying lawsuit against Traxel and the current coverage lawsuit against Gainsco. In response, Gainsco produced some documents, raised general objections to the requests, and asserted the attorney-client and work product privileges in relation to certain other materials. El Naggar then filed motions to compel production, arguing, inter alia, that (1) Traxel had waived and released its attorney-client and work product privileges in relation to the documents in Gainsco's file (in its assignment of claims to El Naggar), and (2) the documents were required to be produced under the crime/fraud exception to the asserted privileges because Gainsco and Traxel had perpetrated a fraudulent transfer by entering into the buyback agreement. Subsequently, Gainsco produced a privilege log and tendered the disputed documents to the trial court for in camera review. In its briefing to this court and in its privilege log, Gainsco grouped the documents into two main categories: those pertaining to the underlying litigation against Traxel and those pertaining to the current (or coverage) suit against Gainsco. Gainsco has also requested that certain documents be redacted if produced because they contain information regarding its reserves for both the underlying litigation and the current litigation.

The trial court granted El Naggar's motions to compel, and ordered Gainsco to produce its entire claims file, without specifying the grounds on which it based its ruling. We will first address Gainsco's assertions of privilege in the underlying case and coverage case documents. We will then address El Naggar's argument that even if some documents are covered by the privileges, the privileges should not apply due to the crime/fraud exception. Lastly, we will address Gainsco's argument that reserves information should be redacted from produced documents.

## II. Standards of Review

 Mandamus is an appropriate remedy only when the record shows: (1) the trial court clearly abused its discretion or violated a duty imposed by law; and (2) no adequate remedy by appeal exists. *In re Daisy Mfg. Co.*, 17 S.W.3d 654, 658 (Tex.2000) (orig. proceeding) (per curiam). A trial court abuses its discretion in determining the legal principles that control its ruling if the court clearly fails to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). Remedy via appeal is generally considered inadequate in the context of discovery disputes when (1) the appellate court would not be able to cure the trial court's error, (2) the ability of the party seeking mandamus to present a viable claim or defense at trial is severely compromised, or (3) the missing discovery could not be made a part of the appellate record. *Id.* at 843. In the case of privi-

leged documents that are erroneously ordered to be produced, the resulting harm—of having the documents inspected, examined, and reproduced—cannot be remedied by appeal. *Id.*

The attorney-client privilege is governed by Rule 503 of the Texas Rules of Evidence. TEX.R. EVID. 503. Under this rule, a "client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." *Id.* 503(b)(1). The privilege covers not only direct communication between lawyer and client but also communications involving the client's representatives and the lawyer's representatives, so long as they were made for the purpose of facilitating legal services to the client. *Id.* 503(b)(1)(A), (D).

The work product privilege is governed by Rule 192.5 of the Texas Rules of Civil Procedure. TEX.R. CIV. P. 192.5. It covers:

> (1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or
>
> (2) a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.

*Id.* 192.5(a).

### III. Documents Pertaining to the Underlying Litigation

As mentioned above, Gainsco has identified two main categories of documents in its claims handling file: those pertaining to the underlying litigation and those pertaining to the current suit. In relation to the first category, the underlying litigation documents, Gainsco argues that the trial court erred in compelling production because (1) Gainsco has properly asserted attorney-client and work product privileges in the documents as Traxel's representative; (2) Gainsco has properly asserted its own privileges in the documents; (3) Traxel's attorney has a right to assert privileges; and (4) the documents are not relevant to any issues in the lawsuit.

### A. Assertion of Traxel's Privileges

In its briefing to this court (and in trial court filings), Gainsco has maintained that it must assert attorney-client and work product privileges on Traxel's behalf, in relation to the underlying litigation documents, because as Traxel's insurer, it was acting as Traxel's representative in the conduct of the underlying litigation. Indeed, many of the documents in question are drafted by, addressed to, or pertaining to communications with Glen Fahl, the attorney whom Gainsco hired to represent Traxel in the underlying litigation.

In its motions to compel and attendant briefing in the court below, El Naggar argued that Traxel's assignment of claims to El Naggar also resulted in waiver of Traxel's right to assert any privileges relative to the documents held by Gainsco. Gainsco responded, in the court below and in its petition, that Traxel did not effectively assign, waive, or release its privileges by agreeing to the assignment because the assignment does not contain express language to that effect, citing *In re Cooper,* 47 S.W.3d 206, 208–09 (Tex.App.-Beaumont 2001, orig. proceeding). After Gainsco filed its petition, however, El Naggar filed in the trial court (with a copy to this court) a second assignment of rights signed by

Traxel's principal, Fred Bell. This document provides in full as follows:

### ASSIGNMENT OF PRIVILEGES REGARDING GAINSCO IN THE UNDERLYING LITIGATION

Fred Bell, individually, and as sole shareholder, officer and representative of Traxel Construction, Inc. (hereinafter collectively referred to as "Bell") hereby grants, conveys, assigns and otherwise transfers to El Naggar Fine Arts Furniture, Inc. and/or Ahmed El Naggar all privileges, rights, and claims of privacy, including but not limited to attorney/client communication privileges, relating to the following specific issues only:

1. Any communications regarding GAINSCO's insurance policy pertaining to El Naggar's claims filed in the underlying litigation styled *Ahmed El Naggar, et al v. Traxel Construction, Inc.,* which was litigated in the 269th Judicial District Court;

2. Any and all communications, deliberations and/or exchanges pertaining to the GAINSCO buyback agreement of the insurance policy pertaining to the underlying litigation, and

3. GAINSCO's claims handling and/or communications with Mr. Fahl regarding the duties to indemnify and/or defend either Bell or Traxel in the above-referenced litigation that was litigated in the 269th Judicial District Court.

This assignment is supplemental and in addition to the previous assignment dated September 22, 2006. It was the intent that the previous September 22, 2006, assignment implicitly contain the assignments set forth herein, and this assignment is simply a more express statement of the previously assigned rights, privileges and interests intended to be conveyed earlier.

This assignment is irrevocable and may not be withdrawn for any purpose.

In response, Gainsco alleges that the assignment (1) is unsworn, unauthenticated hearsay; (2) did not exist and thus was not part of the record when the trial court made its ruling; and (3) may be void as against public policy. Regarding the first argument, El Naggar filed the assignment attached to a Notice of Filing that was signed by El Naggar's counsel and stated that the assignment is what it purports to be. Furthermore, El Naggar subsequently filed a verification, signed by the same attorney, notarized, and purporting to authenticate the copy of the assignment filed with this court. Gainsco does not cite any authority which requires an assignment of privilege or waiver of privilege to be sworn. *See generally* TEX.R. EVID. 511 (providing for waiver of privilege by consent to disclosure).

■ Regarding the second argument, the assignment renders moot many of the issues raised in the petition. We will not issue the extraordinary writ of mandamus to protect privileges that have been waived in the interim. *Cf. In re County of El Paso,* 104 S.W.3d 741, 743 (Tex.App.-El Paso 2003, orig. proceeding) (holding that discovery issues brought in petition for mandamus were rendered moot when subsequent to filing of petition, party withdrew its objections to discovery and the trial court vacated its order); *Fitzgerald v. Rogers,* 818 S.W.2d 892, 895 (Tex.App.-Tyler 1991, orig. proceeding) (refusing to provide mandamus relief to protect privacy rights in tax returns when the rights had already been forfeited by production of the documents). Thus, the fact that El Naggar did not file the second assignment

until after the petition was filed does not preclude our consideration.[1]

Lastly, regarding the third argument, appellant cites no authority suggesting that a party cannot assign its privileges. Instead, appellant analogizes to cases holding that a legal malpractice claim cannot be assigned. *See, e.g., Vinson & Elkins v. Moran,* 946 S.W.2d 381, 392–93 (Tex.App.-Houston [14th Dist.] 1997, no writ); *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.-San Antonio 1994, writ ref'd). The basis for these opinions lies in the special nature of the attorney-client relationship. *See, e.g., Moran,* 946 S.W.2d at 393–94. Gainsco suggests that this same reasoning also prevents a client from assigning attorney-client and work product privileges.

■ However, as illustrated by the present circumstances, assignment of evidentiary privileges is fundamentally different from assignment of a legal malpractice claim. By assigning Traxel's privileges in the documents held by Gainsco, Bell effectively waived the right to assert the privileges. In other words, Traxel (through Bell) has foregone its right to assert the benefits of the attorney-client relationship with Fahl. Conversely, in the malpractice context, the assignor of the claim assigns the right to assert the benefits of the relationship. Whether the assignment of privileges is viewed more as a waiver in itself or as a transfer of the right to waive

the privileges, the result is the same: Traxel may no longer assert the privileges. Consequently, Gainsco no longer has grounds on which to assert privileges on Traxel's behalf.[2] A client unquestionably has the right to waive the attorney-client privilege. Tex.R. Evid. 511. Furthermore, Rule 511 contemplates the possibility that privileges can pass from one person or entity to another. *Id.* (referring to the "predecessor ... holder of the privilege"). Accordingly, we find Gainsco's arguments regarding validity of the assignment, and hence its assertion of Traxel's privileges, to be without merit.

## B. Assertion of Gainsco's Privileges

In its "Response to Real Parties in Interest's Motion to Lift Stay," Gainsco suggests that even if Traxel's assignment is valid, such assignment would not prevent Gainsco from asserting its own privileges in the claims file documents. While this is certainly true of the coverage suit documents discussed below, Gainsco suggests that it is also true for some of the underlying case documents. Gainsco's respective positions are incompatible in their inconsistencies. In its petition, Gainsco clearly and repeatedly asserted that all of the documents identified as pertaining to the underlying litigation were protected from disclosure only because Gainsco was operating as Traxel's representative in the underlying litigation.[3] In its response to the

---

1. Furthermore, both El Naggar and Fred Bell indicated that they thought the first assignment was sufficient to transfer the right to waive the privileges in question. Thus, the second assignment is more in the way of a clarification than a completely new agreement.

2. Arguably, if under different circumstances El Naggar was attempting to enforce rather than waive the privileges it received from Traxel, the analysis could be different. However, El Naggar is clearly asserting waiver,

and Traxel has disassociated itself with any right to assert the privileges. Thus, as stated, Gainsco is left without any basis on which to assert privileges on Traxel's behalf.

3. Gainsco specifically represented that:

Gainsco's actions in engaging defense counsel and monitoring the defense of the underlying suit were to facilitate Traxel's defense in the suit and to further Fahl's rendition of professional legal services to Traxel.... [T]he withheld documents

motion to lift stay, however, Gainsco suggests that it may separately assert its own privileges to protect the same documents. The difficulty is that in the privilege log and the petition, Gainsco has refuted any right to assert its own privileges in the underlying case documents; yet, in the response to the motion, it makes a global assertion that it may have privileges in the same documents.[4] Regardless, it offers little in the way of argument or explanation regarding its right to assert privileges relative to these documents (claiming, in part, that the documents per se demonstrate the applicability of the privileges).

Because protection of attorney-client and work product privileges is an important concern, we have conducted our own document-by-document review. *See generally Duncan v. Bd. of Disciplinary Appeals*, 898 S.W.2d 759, 762 (Tex.1995) ("Our rules recognize that our system of justice relies on a client's privilege to speak frankly and candidly with his or her attorney.") (citing *Fisher v. United States*,

425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)). The underlying case documents can be further grouped into the following categories: (1) communications involving Fahl, the attorney representing Traxel in the underlying litigation; (2) communications involving only Cooper, the attorney representing Gainsco, and Gainsco itself; and (3) computer database notes made by Gainsco employees relating either to Traxel's defense in the underlying case or to coverage issues.

### 1. Communications With Fahl

 Regarding the first subcategory, documents drafted by or addressed to Fahl, Gainsco acknowledges that it cannot assert its own privileges in regards to certain of these documents because Fahl represented Traxel and not Gainsco. Although Gainsco appears to generally assert its own privileges in other Fahl-related documents, it offers no authority or reasoning to support this contention. Gainsco

themselves relating to the underlying suit established the applicability of the work product privilege because they revealed (a) material prepared or mental impressions developed in anticipation and furtherance of Traxel's defense at trial, by a party (Traxel) or a party's representatives (Traxel's attorney, Fahl, and Traxel's insurer, Gainsco); and (b) communications made in anticipation and furtherance of Traxel's defense at trial.... Again, as to the underlying suit, the attorney-client and work product privileges belonged to Traxel, not Gainsco.... As stated, as to the underlying suit, the 'person upon whom these rules confer a privilege against disclosure' is Traxel.

4. Although we will address Gainsco's motion argument, it is important to note that this new argument is not simply an alternative to the previous argument, it is a completely contrary argument. The factual premise of Gainsco's petition argument-that the underlying litigation documents are privileged solely based on Traxel's attorney-client and work

product privileges-has not been disproved or refuted. El Naggar, in fact, basically agrees that the privileges attached to these documents are Traxel's. In its fallback argument, Gainsco asserts that it could protect the documents even from Traxel.

As will be discussed, many of the designated underlying case documents were drafted by, addressed to, or pertaining to communications with Fahl, the attorney representing Traxel in the underlying litigation; thus, the attorney-client privilege regarding these documents could only belong to Traxel and not Gainsco. *See* Tex.R. Evid. 503(b)(1). Furthermore, in order for a person or entity to assert the work product privilege, the material in question must have been created in anticipation of litigation. *See* Tex.R. Civ. P. 192.5. Gainsco was not a party to the underlying litigation and does not suggest that it anticipated becoming a party. While Gainsco claims that it anticipated becoming a party to future coverage litigation, it has made this representation specifically only regarding documents related to the coverage suit.

has not established the existence of an attorney-client relationship with Fahl (indeed, it has steadfastly denied it). Accordingly, Gainsco cannot assert attorney-client privilege in its communications with Fahl, and it cannot assert attorney work product in regards to documents prepared by Fahl. *See* Tex.R. Civ. P. 192.5; Tex.R. Evid. 503(b)(1).

## 2. Communications with Cooper

■ Regarding the second subcategory—communications involving only Cooper and Gainsco—these documents are covered by Gainsco's attorney-client privilege. All of the documents falling in this category are invoices for legal services from Cooper to Gainsco (including Bates Nos. G01386–88, 1389–91, 1392–93, 1394–96, 1428–37, 1441–44, and 1658–62).

## 3. Database Notes

■ In the third and final subcategory, Gainsco asserts privileges regarding entries in a database of file notes.[5] These notes are uniformly terse statements of events (court filings, receipt of documents, communications, settings, etc.) regarding the lawsuit filed by El Naggar against Traxel. In reviewing many of these notes, it is not clear whether they pertain only to Traxel's defense in the underlying litigation or whether they also involve coverage issues. Additionally, in some of the notes, it is unclear whether the attorney being referenced was Fahl or Cooper. Gainsco offers no explanation or evidence to clarify these ambiguities, merely arguing instead that the documents themselves reveal their privileged nature. The party asserting a privilege has the burden of demonstrating application of the privilege. *See* Tex.R.

Civ. P. 193.3(a), (b); *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex.2005); *see also Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 591 (Tex.App.-Dallas 1994, orig. proceeding) (holding that party asserting privilege met burden by providing affidavits and a detailed privilege log). In its privilege log, Gainsco identified all of the notes as relating to the underlying litigation. Furthermore, in its petition, Gainsco steadfastly asserted that all of the documents identified as pertaining to the underlying litigation were protected from disclosure only because Gainsco was operating as Traxel's representative in the underlying litigation. Accordingly, where Gainsco has offered no new explanation for the asserted privileges, we will default to its original explanation (*i.e.*, that the only privilege asserted are Traxel's) unless the substance of the individual note clearly demonstrates otherwise.

■ More specifically, many of the entries appear to reference communications with Fahl. Because Fahl represented Traxel and not Gainsco, it appears that any privilege attached to these entries would exist based only on Gainsco's professed capacity as representative of Traxel. Thus, Traxel's assignment of its privileges effectively waived any privileges attached to these documents. Gainsco can therefore assert no independent privilege in regards to these notes.

■ Only a handful of notes facially reflect that they were generated from conversations with Cooper or clearly relate to coverage issues as opposed to underlying case issues (including: (1) note dated December 7, 2004 at Bates No. G01060; (2)

5. This database, part of a document management system known as "ImageRight," allowed Gainsco employees to input file notes automatically organized by date and time. A printout of the notes was included with the in

camera documents, and the individual notes were listed on the privilege log. Gainsco employees apparently did not keep separate sets of notes for issues related to Traxel's defense and issues related to coverage.

note dated October 5, 2004, 9:05 a.m., at Bates No. G01061; (3) note dated October 4, 2004, 10:56 a.m., at Bates No. G01062; and (4) note dated September 24, 2003 at Bates No. G01066). These notes are covered by Gainsco's attorney-client privilege. Gainsco has not sufficiently demonstrated that any other notes are covered by any privilege.

## C. Reliance on Attorney's Privileges

■ Next, Gainsco suggests that even if Traxel's assignment of privileges is valid, any waiver of privileges by Traxel would not prevent Glen Fahl from asserting his core work product privilege to prevent production of the documents in Gainsco's possession.[6] However, while Gainsco has included an affidavit from Fahl in the record, Fahl makes no assertion of any privilege in the affidavit. Instead, Fahl states that "this affidavit is offered as a perfunctory matter to substantiate the Gainsco's [sic] claim of privilege." He then goes on to specify that the documents in Gainsco's possession are privileged because he reported to and communicated with Gainsco "in furtherance of Traxel's defense in the Lawsuit." Fahl himself has asserted no individual right or desire to prevent disclosure of the documents even though given the opportunity to do so. Further, in his affidavit, Fahl does not refute the fact that Traxel has waived (or at least assigned) the very privileges of which he is writing in support. Accordingly, we find Gainsco's argument that it is entitled to protect

Fahl's privileges to be without support in the record and thus without merit.

## D. Relevancy Objection

Lastly, Gainsco contends that the trial court erred in refusing to sustain its relevancy objection to the request for the claims file. Gainsco relies on *Maryland American General Insurance Co. v. Blackmon*, 639 S.W.2d 455 (Tex.1982), for the proposition that an insurer's claims file documents are not relevant until the insurer's liability, for coverage or for breach of contract, has been established. However, Gainsco misreads the *Blackmon* holding in two key respects. First, the *Blackmon* court did not hold that the file in question was irrelevant; rather, it held that the file was protected from production by the attorney-client and work product privileges. 639 S.W.2d at 458. Indeed, the court stated: "We will assume for purposes of this opinion that the information ordered to be disclosed is relevant." *Id.* at 457.[7] Second, the file at issue in *Blackmon* was not an underlying claims file, such as that identified by Gainsco in the present case, but an investigative file that contained materials pertaining to the insurer's decision to not pay a claim. *Id.* at 457.[8] The insurer in *Blackmon* was not attempting to assert the insured's privileges to prevent disclosure of the file, as Gainsco does here. Accordingly, the lessons of *Blackmon* are inapposite to the present case, and we cannot say that the trial court abused its discretion in refusing to sustain Gainsco's

---

6. In support of its argument, Gainsco relies upon a case construing the federal counterpart to the Texas work product privilege. *See In re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir.1994).

7. The core holding of *Blackmon* is that a plaintiff/insured cannot defeat the attorney-client and work product privileges of an insurer simply by alleging bad faith; however,

the privileges *may* be defeated once liability is established. 639 S.W.2d at 458.

8. As discussed above, to the extent Gainsco is contending that documents in the claims file relate to its decision to not pay El Naggar's claim, it has identified these documents as pertaining to the coverage suit not the underlying litigation. These documents are discussed below.

relevancy objection to the requests for production.

Gainsco has represented that it could not produce the documents identified as underlying case documents because to do so would violate Traxel's privileges barring such disclosure. We disagree. Except for the few documents we have identified as clearly covered by Gainsco's own privileges, the assignment by Traxel effectively waived claims of privilege for all of the underlying litigation documents.

## IV. Documents Pertaining to the Current Coverage Suit

■ The second category of documents regarding which Gainsco has asserted privileges pertains to the current coverage suit. In its privilege log, Gainsco lists eighteen current-suit claims-file documents as responsive to the requests for production. Of these eighteen documents, Gainsco asserts privileges to only ten. Of these ten, three were drafted after the trial court's cut-off date in the order compelling production; thus, Gainsco was not ordered to produce them.[9] Of the remaining seven documents, five are transmittal cover letters or facsimile cover sheets. There is nothing clearly confidential in nature about the contents of any of these five documents. *Cf. Valero Transmission, L.P. v. Dowd*, 960 S.W.2d 642, 645 (Tex. 1997) (holding that cover letter from lawyer to client transmitting draft of agree-

ment was privileged because it gave specific legal advice concerning the draft). At most, each simply identifies the document being transmitted and asks the recipient to review it. The "to" and "from" information on the cover sheets was also included in Gainsco's privilege log, of which El Naggar received a copy, and the referenced documents were all produced. Accordingly, we cannot say that the trial court clearly abused its discretion in ordering production of these five documents.

■ The remaining two documents include (1) the request from Preen (Gainsco's designated claims adjuster for El Naggar's claims) to Cooper (Gainsco's coverage attorney) for a coverage opinion regarding the underlying litigation and (2) Cooper's responsive coverage opinion (respectively, Bates Nos. G01068–69 and G00979–996). Both of these documents clearly contain confidential communication made for the purpose of facilitating the rendition of professional legal services to Gainsco. *See* Tex.R. Evid. 503(b)(1).[10] Thus, these documents are covered by the attorney-client privilege.

## V. Crime/Fraud Exception

■ El Naggar contends, however, that Gainsco cannot assert the attorney-client privilege with regard to any of the underlying case documents or the coverage case documents because the crime/fraud exception applies.[11] Under this exception,

---

9. The trial court ordered Gainsco to produce documents created before February 5, 2005, which was the date on which El Naggar filed the current lawsuit.

10. As claims adjuster for the El Naggar claims, Preen was clearly a representative of the client in regards to these documents under the meaning of Rule 503. Tex.R. Evid. 503(a)(2) ("A representative of the client is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client.").

11. El Naggar also argues generally that an insurer's claims file in relation to a lawsuit against an insured is not protected from discovery in subsequent litigation against the insurer, citing *Turbodyne Corp. v. Heard*, 720 S.W.2d 802, 803 (Tex.1987); *Allen v. Humphreys*, 559 S.W.2d 798, 803 (Tex.1977); *Victoria Lloyds Insurance Co. v. Gayle*, 717 S.W.2d 166, 168 (Tex.App.-Houston [1st Dist.] 1986, orig. proceeding); and *Service Lloyds Insurance Co. v. Clark*, 714 S.W.2d 437, 439 (Tex.App.-Austin 1986, orig. proceeding).

the attorney-client privilege cannot be enforced when "the services of the lawyer were sought or obtained to enable or aid anyone to commit what the client knew or reasonably should have known to be a crime or fraud." TEX.R. EVID. 503(d)(1). Once the party resisting discovery establishes that documents are protected by the attorney-client privilege, the party seeking the documents may establish that the crime-fraud exception applies to defeat the privilege. *See Freeman v. Bianchi*, 820 S.W.2d 853, 861 (Tex.App.-Houston [1st Dist.] 1991, orig. proceeding), *mand. denied sub nom, Granada Corp. v. Honorable First Court of Appeals*, 844 S.W.2d 223 (1992). The exception applies only when (1) a prima facie case is made of contemplated fraud, and (2) there is a relationship between the document at issue and the prima facie proof offered. *Granada Corp.*, 844 S.W.2d at 227. A prima facie showing is sufficient if it sets forth evidence that, if believed by a trier of fact, would establish the elements of a fraud or crime that "was ongoing or about to be committed when the document was prepared." *Coats v. Ruiz*, 198 S.W.3d 863, 876 (Tex.App.-Dallas 2006, no pet.); *Freeman*, 820 S.W.2d at 861. A court may look to the document itself to determine whether a prima facie case has been established. *Cigna Corp. v. Spears*, 838 S.W.2d 561, 569 (Tex.App.-San Antonio 1992, orig. proceeding); *Freeman*, 820 S.W.2d at 862.

Here, El Naggar has alleged that Gainsco committed a "fraudulent transfer" by entering into the buyback agreement with Traxel. "Fraudulent transfer," as will be discussed below, is a statutory term of art that does not necessarily equate to the term "fraud" as used in the crime/fraud exception. *See* TEX. BUS. & COM.CODE ANN. §§ 24.001–.013 (Vernon 2002 & Supp.2006) (the Texas Uniform Fraudulent Transfer Act); TEX.R. EVID. 503(d)(1). El Naggar offers no analysis regarding whether the crime/fraud exception applies in the fraudulent transfer context. Although it may in fact apply under certain circumstances, we conclude that it does not apply here, based on El Naggar's allegations in the present lawsuit.

We begin our analysis by examining the scope of the fraud portion of the crime/fraud exception. The Texas Rules of Evidence do not define what is intended in Rule 503(d)(1) by the phrase "to commit ... [a] fraud." Black's Law Dictionary defines fraud as: "A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." BLACK'S LAW DICTIONARY 670 (7th Ed.1999). The Texas common law tort of fraud also requires proof of misrepresentation, concealment, or non-disclosure. *See Custom Leasing, Inc. v. Tex. Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 142–43 (Tex.1974); *Daugherty v. Jacobs*, 187 S.W.3d 607, 617–18, 620 (Tex.App.-Houston [14th Dist.] 2006, no pet.). The legal concept of fraud therefore has at its core a misrepresentation or concealment. This definition also dovetails with the apparent reasoning behind inclusion of fraud in the exception: by keeping client communications confidential—pursuant to the attorney-client privi-

However, each of these cited cases involved assertions of the party communications privilege contained in former Rule 166b(3)(d) of the Texas Rules of Civil Procedure. TEX.R. CIV. P. 166b(3)(d) (repealed 1998) (see now TEX.R. CIV. P. 192.5(a)(2)). These cases have no impact on Gainsco's assertion of attorney-client privilege. Unlike the old and the new rules governing party communications, the attorney-client privilege is not limited in its application to communications made in anticipation of litigation. *Compare* TEX.R. CIV. P. 192.5(a)(2) *and Turbodyne*, 720 S.W.2d at 803–04 (discussing former rule 166b(3)(d)), *with* TEX.R. EVID. 503.

lege—the attorney whose client intends to make a misrepresentation or concealment helps prevent the injured party from learning the truth about the misrepresentation or concealment. Thus, in that situation, the attorney's silence affirmatively aids the client in committing the tort. This is not generally true of other torts (not based on misrepresentation or concealment) and explains why the exception is not the crime/ *tort* exception.

In *Volcanic Gardens Management Co. v. Paxson,* the El Paso Court of Appeals similarly concluded that

> under the crime/fraud exception to the lawyer-client privilege, "fraud" would include the commission and/or attempted commission of fraud on the court or on a third person, as well as common law fraud and criminal fraud. The crime/ fraud exception comes into play when a prospective client seeks the assistance of an attorney in order to make *a false statement or statements of material fact or law* to a third person or the court for personal advantage.

847 S.W.2d 343, 348 (Tex.App.-El Paso 1993, orig. proceeding) (emphasis added). The court explained that it was taking a broad view of what constituted a fraud for application of the exception, explaining that other courts had restricted its meaning to include only actionable common law fraud. *Id.* at 347 (discussing *Freeman,* 820 S.W.2d 853, and *Spears,* 838 S.W.2d 561). Thus, it is clear that for the fraud portion of the crime/fraud exception to apply, there must be at least a prima facie showing that a misrepresentation or concealment was ongoing or about to be committed when the document in question was prepared.

El Naggar alleges fraudulent transfer as the basis for application of the crime/fraud exception in the present case. Fraudulent transfer is a statutory cause of action that permits a creditor to recover assets transferred by a debtor under certain circumstances. TEX. BUS. & COM.CODE ANN. §§ 24.005, .008, .009. Although concealment of the transfer is one factor that may be considered in determining whether a transaction is deemed fraudulent under the statute, it is not a required element of the cause of action. *Id.* § 24.005(a), (b). Thus, an allegation and prima facie case of fraudulent transfer does not mandate application of the crime/fraud exception unless it includes an allegation and prima facie case of concealment.

In its petition, El Naggar alleged Gainsco and Traxel entered into the buyback agreement "to avoid, frustrate, hinder, delay and defraud" El Naggar from collecting on the insurance policy and thereby committed a fraudulent transfer.[12] As proof of the fraudulent transfer, El Naggar points to the facts that (1) the buyback was negotiated in secret, (2) it contained a confidentiality term, and (3) it contained an agreement to make a representation that there was no insurance for Traxel in the underlying case. Although each of these statements appears to be true, at least as far as it goes, under the circumstances of this case (as acknowledged by El Naggar), none amounts to a prima facie case of concealment or misrepresentation. While the typewritten language in the buyback agreement contains a confidentiality term, handwritten and ini-

12. In granting a partial summary judgment favoring El Naggar, the trial court has declared the Gainsco–Traxel buyback agreement to be void, apparently as against public policy. However, because (1) this order was not made an object of Gainsco's petition for writ of mandamus and (2) we need not answer the question in order to decide the issues before us, we take no position on whether such an agreement violates public policy in Texas.

tialed language on the same page of the agreement permitted Traxel to apprize El Naggar of the buyback. A short time after entering the agreement, Traxel informed El Naggar of the buyback. Thus, although the original typewritten language suggests that at one point there was an intention to conceal, there was no effective concealment (and no indication that a misrepresentation was ever made). According to El Naggar's pleadings and all the relevant evidence in the record, the buyback agreement was entered into shortly before the second trial in the underlying case, and El Naggar was also informed of the agreement shortly before the trial. Indeed, El Naggar received a relatively large verdict and judgment at the conclusion of the second trial and then attempted to have the judge in that case throw out the buyback agreement. While there may have been a brief period between signing the agreement and disclosure to El Naggar, there is no evidence of an attempt to conceal execution of the agreement from El Naggar. To the contrary, by its own terms, the agreement permitted disclosure to El Naggar, and Traxel informed El Naggar of the agreement shortly after it was signed. Accordingly, El Naggar has failed to present a prima facie case that

the crime/fraud exception should apply to defeat Gainsco's assertions of attorney-client privilege.[13]

## VI. Redaction of Reserves Information

■ Gainsco additionally contends that the trial court abused its discretion in refusing to permit redaction of reserves information from documents Gainsco is otherwise required to produce. In its privilege log, Gainsco identified certain documents containing notations of reserves for either the underlying litigation or the current litigation. Gainsco asserts that this information should be redacted because it is not relevant to any issues in the case, would not be admissible at trial, and would not lead to the discovery of admissible evidence, citing *In re American Home Assurance Company*, 88 S.W.3d 370, 377 (Tex.App.-Texarkana 2002, orig. proceeding).

Gainsco does not, however, address the question of whether this issue is a proper subject for mandamus. As discussed above, mandamus is an appropriate remedy only when (1) the trial court has clearly abused its discretion, and (2) no adequate

---

13. The *Volcanic Gardens* court held that the crime/fraud exception could apply to any false statement regardless of whether it constituted actionable fraud. 847 S.W.2d at 348. While we agree with the court's conclusion that there must be a misrepresentation or concealment before the fraud portion of the crime/fraud exception can apply, we need offer no opinion regarding whether the exception can apply absent a prima facie showing of an actionable claim for fraud. Because we hold that El Naggar has failed to present a prima facie case that any misrepresentation or concealment occurred, we do not reach the question of whether an actionable fraud occurred.

Furthermore, we note that the crime/fraud exception would also not apply to the request for the coverage opinion and the coverage opinion itself because no relationship has

been established between those documents and the alleged fraud. *Granada Corp.*, 844 S.W.2d at 227. The request for the coverage opinion was dated September 3, 2003, and the coverage opinion was dated September 16, 2003. Other than the fact that they discuss the possibility of coverage in the underlying litigation, neither document references anything pertaining to the buyback agreement. The evidence establishes that it was Traxel that first approached Gainsco about entering into a buyback agreement (possibly through Fahl), and the agreement itself was not signed until October 6, 2004, more than a year after the request and the coverage opinion were exchanged. El Naggar points to nothing in the record establishing a nexus between these documents and the allegedly fraudulent buyback agreement.

remedy by appeal exists. *In re Daisy Mfg. Co.*, 17 S.W.3d at 658. Gainsco makes no argument regarding whether there is an adequate remedy by appeal on this issue. In *Walker v. Packer*, the court explained that a party may not have an adequate remedy by appeal "where a discovery order compels the production of patently irrelevant … documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." 827 S.W.2d at 839. Gainsco makes no argument based on harassment or burden. Indeed, it would actually be more burdensome here to redact the information from the documents to be produced.[14]

In *In re American Home*, the case cited by Gainsco, the court did conditionally grant mandamus on the trial court's order requiring reserves information to be produced. 88 S.W.3d at 377. However, the circumstances were very different in that case. To begin with, the court was considering whether the trial court's entire order to compel was too broad in scope and thus too burdensome. *Id.* at 372.[15] The reserves information was just one portion of the order. Further, the order required "documentation and deposition information regarding the setting of reserves for third-party claims against the plaintiffs." *Id.* at 377. Although it is not entirely clear exactly what would have been required to satisfy the order, it reads considerably more broadly and appears to be more burdensome than the trial court's order before us. Accordingly, we decline to issue mandamus to require redaction of the reserves information.[16]

## VII. Conclusion

We hold that the trial court abused its discretion by compelling production of certain of the underlying case documents (including the documents at Bates Nos. G01386–88, 1389–91, 1392–93, 1394–96, 1428–37, 1441–44, and 1658–62, and the database notes dated: December 7, 2004 at Bates No. G01060; October 5, 2004, 9:05 a.m., at Bates No. G01061; October 4, 2004, 10:56 a.m., at Bates No. G01062; and September 24, 2003 at Bates No. G01066) as well as the coverage opinion request and the coverage opinion (respectively, Bates Nos. G01068–69 and G00979–996).

14. Gainsco does make the general point that requiring insurers to disclose reserves information could result in inflated reserves and, in turn, interfere with state insurance departments' duty of protecting consumers. However, we are not requiring Gainsco to produce anything in this proceeding, we are simply considering whether mandamus should issue against the trial court's order. Thus, Gainsco's concern that a rule requiring disclosure of reserves information would have widespread impact is not implicated here.

15. The court cited *K Mart Corp. v. Sanderson*, 937 S.W.2d 429, 431–32 (Tex.1996), for the proposition that a party ordered to produce overly-broad discovery "well outside the bounds of proper discovery" has no adequate remedy by appeal. *In re Am. Home*, 88 S.W.3d at 372.

16. Interestingly, El Naggar does not address the reserves issue on appeal and appears to have not done so in the trial court. Furthermore, the trial court's orders do not specifically mention Gainsco's request to redact reserves. It is unclear whether the court ever explicitly considered the matter.

Because of our resolution of these discovery issues in this original proceeding, we take no position regarding whether the reserves information would be admissible if offered at trial. However, we note that the question of whether reserves information is relevant in coverage or bad faith cases may be a far more complex issue than Gainsco suggests. *See generally State of West Virginia ex rel. Erie Prop. & Cas. Ins. Co. v. Mazzone*, 218 W.Va. 593, 625 S.E.2d 355, 358–60 (2005) (discussing cases from various jurisdictions); *id.* at 360–67 (Davis, J., concurring) (same).

We further hold that Gainsco does not have an adequate remedy by appeal in regards to production of these documents. *See Walker*, 827 S.W.2d at 839. We find no other error in the trial court's order compelling production. Accordingly, we grant relief in part and conditionally grant the petition for writ of mandamus. The writ will issue only if the trial court fails to act in accordance with this opinion.